# Exhibit A

**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**MIAMI, FLORIDA**

| | | |
|---|---|---|
| DANA JOHNSON, on behalf of himself and others similarly situated, | ) ) ) | |
| Claimant, | ) ) | |
| v. | ) ) | |
| SMILEDIRECTCLUB, LLC; DAVID KATZMAN; STEVEN KATZMAN; ALEXANDER FENKELL; JEFFREY SULITZER; and CAMELOT VENTURE GROUP, | ) ) ) ) ) ) | Case No.: _____ |
| Defendants. | ) ) | |

<u>**DEMAND FOR ARBITRATION**</u>

Claimant Dana Johnson, individually and on behalf of a class of consumers, for his demand as against defendants SmileDirectClub, LLC ("SmileDirect"), David Katzman, Steven Katzman, Alexander Fenkell, Jeffrey Sulitzer, and Camelot Venture Group ("Camelot"), does hereby allege as follows:

**INTRODUCTION**

1.      SmileDirect is a company under siege. It is currently subject to a barrage of litigation and customer complaints that challenge its business model and set forth substantiated allegations that SmileDirect is operating illegally in violation of provisions of the federal Food, Drug, and Cosmetic Act (the "FD&C Act").

2.      More specifically, SmileDirect is currently subject to:

      a. At least 40 state claims filed by the relevant state affiliate of the American Dental Association ("ADA"), American Association of Orthodontists ("AAO"), or

similar organizations alleging, in a substantiated fashion, that SmileDirect is illegally operating as a dentist without proper licensing in the subject state. Indeed, a Federal District Court in Georgia recently found that SmileDirect was in fact illegally operating as a dentist in connection with its ordinary course practices. (*See* Exhibit 1, attached hereto.)

b.  A lengthy, detailed and substantiated Citizen Petition filed by the American Dental Association with the federal Food and Drug Administration ("FDA") alleging in a detailed and substantiated fashion that SmileDirect is in continuing violation of the FD&C Act because it is selling plastic aligners that it manufactures in Tennessee (a) without a valid prescription and (b) without having had such aligners approved pursuant to a 510(k) clearance procedure. (*See* Exhibit 2, attached hereto.)

c.  A complaint filed by the ADA with the Federal Trade Commission ("FTC") requesting that the FTC investigate numerous false and misleading claims made by SmileDirect to fraudulently entice customers to purchase its products and services. The ADA's detailed lengthy complaint alleges that SmileDirect has made false and misleading claims and engages in unfair and deceptive practices within the meaning of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. (*See* Exhibit 3, attached hereto.)

d.  Thousands of substantiated, serious customer complaints with respect to the efficacy of the SmileDirect aligner treatment and injuries suffered with respect thereto. Among these thousands of complaints are complaints that the product did

not work, that the product came in a broken fashion, and that the product made consumers' teeth "worse" and, in certain instances, substantially worse:

- "Product made my teeth worse with spacing and gaps. Did not work as described and was led to believe it would get fixed ... After five months and four aligners and a cracked tooth and numerous attempts to talk to customers service to fix my issues all of which led nowhere."

- "Please don't do this to yourself - especially if you're just trying to save money ... A few months closer to the seventh month, my crown and implant - which was super expensive to get done - came off together. When I called them about this, they kept making me email people ... I am here months later with about the same smile as before, $1700 down the drain, and my crown and implant not intact."

A sample of such comments is attached hereto as Exhibit 4.

3.     Rather than address and seek to remedy these substantiated complaints alleging illegal operation, false advertising, and violations of the FTCA and the FD&C Act, SmileDirect instead has taken the low road by (a) refusing to make refunds to customers who have had bona fide problems with the aligners and/or damage relating to their teeth and (b) bringing litigation against ADA or AAO state affiliates and their board members to deflect the claims contained in their state-filed complaints with respect to SmileDirect's illegal operation.

4.     Moreover, SmileDirect has engaged in a deliberate, intentional, and well-lawyered campaign to stifle any legitimate, publicly-stated concerns or peer-related criticisms of its product and/or business practices.

5.      Indeed, SmileDirect has retained numerous law firms in the United States and elsewhere, who on a regular and continuous basis have sent threatening, overbroad, and improper letters to dentists, orthodontists, and others who have expressed professional opinions with respect to the inadequacy of the SmileDirect treatment. Moreover, on information and belief, SmileDirect has had its agents post false negative internet reviews of dentists who have questioned SmileDirect's results.

6.      These dentists, orthodontists, and other parties have received a barrage of "cease and desist" letters from SmileDirect's counsel threatening lawsuits and threatening the filing of ethical complaints with regulators against such professionals who have merely voiced legitimate, substantiated opinions regarding the clear inadequacy of the SmileDirect Program. (*See* Exhibit 5, attached hereto.)

7.      Indeed, on January 21, 2020, the New York Times published an article about Smile Direct entitled "This Company Says It Will Fix Your Smile. It May Shush You if It Doesn't." and subtitled "SmileDirectClub, which sells teeth aligners online, has worked to limit information about customer dissatisfaction." A copy of the article is attached hereto as Exhibit 6. In that article, the New York Times quotes Arthur L. Caplan, a professor of medical ethics at the New York University School of Medicine, as stating, "[t]hey've been almost like nervous bullies to critics." The article notes that, "[w]hen some of the customers requested refunds, SmileDirectClub asked them to sign the confidentiality provision. The agreement prohibited the customers from telling anyone about the refund and required them to delete negative social media comments and reviews, according to a copy viewed by The Times." It further notes that, "[i]n addition to linking confidentiality to refunds, the company sued the parent of the productivity site Lifehacker last year for defamation and libel over an article that outlined the

risks of its products. It also sued several state dental boards, the bodies that regulate dentistry, after they took steps that would have made it harder for SmileDirectClub to operate."

8.     SmileDirect's litigation offensive is purposeful. SmileDirect needed to deflect, defer and cover up legitimate criticism of its inadequate practices and illegal business model because SmileDirect was in the process of "going public".

9.     SmileDirect filed a prospectus pursuant to which it intended to raise more than $1 billion in the public equity markets and pursuant to which it valued itself at more than $8 billion ("Prospectus"). (Exhibit 7, attached hereto.)

10.     The Prospectus fails to disclose to the public the numerous bona fide complaints with respect to SmileDirect's illegal practice of dentistry, defective business model, and defective products.

11.     Moreover, the Prospectus contains numerous representations about SmileDirect's business that are inconsistent with other written representations made by SmileDirect in its advertising and extensive online and television marketing and thus show these pervasive marketing representations to be literally false.

12.     In September 2019, SmileDirect went public. As a result of public disclosure of its fraudulent business model and the extensive litigation in which it is involved, its stock is currently trading at approximately 50% of its initial public value, representing a loss to investors of approximately $4 billion.

13.     On November 13, 2019, SmileDirect held an earnings call for investors. (*See* Exhibit 8, attached hereto.) On that call, SmileDirect's CEO, David Katzman, said that SmileDirect's legal expenses were expected to double again in the fourth quarter of 2019, due, in part, to SmileDirect's "investment" in lobbying efforts in the United States. One of those efforts

is to lobby "a handful" of states to relax the laws regarding teledentistry before SmileDirect faces more challenges from regulators. Those lobbying efforts recently failed in California, which passed new teledentistry regulations to protect its consumers requiring SmileDirect to have a dentist present at oral examination. SmileDirect called those consumer protections "anticompetitive" and complained that such protections would introduce "unnecessary hurdles and costs."

14.     In sum, despite having been found to be illegally operating as dentists, despite a business model that is destined to fail, and despite thousands of bona fide customer complaints, SmileDirect is waging a war against longstanding regulatory authorities and its own customers to prevent the pot from boiling over while it raises money in the public markets without proper disclosure as to its illegal, improper business practices and ineffective orthodontic treatment.

## THIS ACTION

15.     In an effort to remedy the harm visited on consumers by SmileDirect's illegal and harmful business practices, Claimant seeks to represent a class of consumers nationwide who have been deceived and have received fraudulent and misleading written marketing material with respect to the SmileDirect aligners and services. Each Class Member has signed the arbitration agreement at issue or a substantially similar arbitration agreement. Claimant also seeks to represent a subclass of consumers resident in Florida who have been deceived and have received fraudulent and misleading written marketing material with respect to the SmileDirect aligners and services who have specific claims under Florida law. These parties seek to proceed under federal law, Florida law, and Tennessee law.

16.     As set forth in more detail below, SmileDirect has engaged in a well-funded marketing campaign in print, on television, and on the internet that has made literally false

statements about its aligners. This campaign of falsity involved more than $100 million of marketing in 2018 and a 125-person, in-house ad agency that deliberately and falsely described the attributes of the SmileDirect aligners in an effort to deceive customers and improperly gain market share.

## ARBITRATION PROVISION ALLOWS FOR CLASS ARBITRATION

17.    At all relevant times, each Class Member's contract with SmileDirect contained an Arbitration Provision, which allows for arbitration on a class basis.

The Arbitration Provision reads:

AGREEMENT TO ARBITRATE – I hereby agree that any dispute regarding the

products and services offered [b]y SmileDirectClub and/or affiliated dental professionals,

including but not limited to medical malpractice disputes, will be determined by

submission to arbitration and not [b]y lawsuit filed in any court, except claims within the

jurisdiction of Small Claims Court, I understand that to initiate the arbitration, I must

send a Demand for Arbitration via U.S. Mail, postage prepaid to Alex Fenkell,

SmileDirectClub, LLC, Bank of America Plaza, 414 Union Str., 8th Floor, Nashville, TN

37219, Nashville, Tennessee 37203. The Demand for Arbitration must be in writing to all

parties, identify each defendant, describe the claim against each party, and the amount of

damages sought, and the names of the Patient and his/her attorney. I agree that the

arbitration shall be conducted by a single, neutral arbitrator selected by the parties and

shall be resolved using the rules of the American Arbitration Association.

(Exhibit 9, attached hereto.)

18.    Claimant Johnson was previously a plaintiff in *Ciccio et al. v. SmileDirect Club LLC et al.*, Case No. 3:19-cv-00845, a civil action filed in the United States District Court for the

Middle District of Tennessee. Pursuant to a Motion to Compel Arbitration filed by the defendants in that case against another plaintiff, Dena Nigohosian, the court held that "gateway" issues such as the scope of the Arbitration Provision are to be decided by the Arbitrator. (*See* Exhibit 10, attached hereto, at 4 ("With regard to whether the arbitration provision clearly commits gateway issues to the arbitrator, SmileDirect relies on the fact that the provision states that any arbitration thereunder shall be resolved using the rules of the American Arbitration Association ('AAA'). AAA Rules grant an arbitrator the power to construe and rule on her own jurisdiction, and the Sixth Circuit has, therefore, suggested that an incorporation of the AAA rules is, generally speaking, an indication of an agreement to have the arbitrator make the initial determination of arbitrability.") (citation omitted); Exhibit 11, attached hereto, at 9.)[1] Thus, Defendants have conceded—and are judicially estopped from arguing otherwise—that the Arbitrator, pursuant to AAA rules, has sole authority to decide gateway issues because the Arbitration Provision incorporates AAA rules.

19.     Specifically, SmileDirect argued to the Court that the Arbitrator, pursuant to AAA rules, has sole authority to decide gateway issues. (*See* Exhibit 11 at 9 ("By incorporating the AAA's Commercial Arbitration Rules, the ADR Provision delegates gateway questions of arbitrability to the arbitrator. Specifically, Rule 7(a) provides: 'The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.' Courts thus must defer to arbitrators to determine issues of arbitrability 'so long as they are *arguably* covered by the agreement.'") (quoting *Willacy v. Marotta*, 683 F. App'x 468, 471 (6th Cir. 2017)) (footnote omitted); *see also id.* ("Because the arbitration provision

---

[1] After the order was entered, Claimant Johnson voluntarily dismissed his claims in that case without prejudice, in order to bring this arbitration proceeding.

shows that the parties delegated all issues of arbitrability to an arbitrator, the Court should order [the Consumer] to pursue her claims either in small-claims court or through arbitration. If [the Consumer] chooses arbitration, the Court should leave any arbitrability questions for the arbitrator to decide.").)[2]

20.     The AAA Supplementary Rules for Class Arbitrations, which supplement other applicable AAA rules, including the rules granting the arbitrator the power to rule on his or her own jurisdiction (including the scope of the arbitration agreement or the arbitrability of any claim or counterclaim), contain a provision granting the Arbitrator the additional authority to determine the threshold issue of whether the Arbitration Provision permits the arbitration to proceed on behalf of a class. *See* AAA Supplementary Rules for Class Arbitrations, Rule 3 ("Upon appointment, the arbitrator <u>shall</u> <u>determine</u> as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the 'Clause Construction Award').") (emphasis added).[3]

21.     Accordingly, the AAA rules, which require the Arbitrator to determine his or her own jurisdiction, require the Arbitrator here to determine the gateway class certification issue.

---

[2] The AAA Consumer Arbitration Rules contain a provision (Consumer Rule 14(a)) identical to Commercial Rule 7(a): "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Consumer Arbitration Rules, R-14(a). The AAA Supplementary Class Rules contain a similar provision, as detailed below.

[3] The AAA Supplementary Class Rules apply to this arbitration because it is a putative class arbitration. *See* AAA Supplementary Rules for Class Arbitrations, Rule 1(a) ("These Supplementary Rules for Class Arbitrations ('Supplementary Rules') shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ('AAA') where a party submits a dispute to arbitration on behalf of or against a class or purported class, and shall supplement any other applicable AAA rules.").

This delegation of authority to the Arbitrator in the AAA rules is consistent with applicable Eleventh Circuit authority, which holds that an arbitration clause like SmileDirect's delegates to the Arbitrator the authority to determine whether the arbitration clause at issue permits class arbitrations. *See JPay, Inc. v. Kobel*, 904 F.3d 923, 936-44 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1545, 203 L. Ed. 2d 711 (2019), a copy of which is attached hereto as Exhibit 12. Indeed, the AAA Arbitrators' Opinion, Order and Award on Clause Construction in *JPay, Inc. v. Kobel* found that the arbitration clause there, which is substantially similar to the one drafted by SmileDirect and imposed on each Class Member here, permitted class arbitration. *See* Opinion, Order and Award on Clause Construction, attached hereto as Exhibit 13.

22.     The language of SmileDirect's Arbitration Provision is clear. First, the Arbitration Provision contains a broad delegation clause. Within the scope of what may be submitted to arbitration is "any dispute" regarding the products and services at issue here. Moreover, the Arbitration Provision contains an exception to arbitration – "except claims within the jurisdiction of Small Claims Court" – which shows that SmileDirect knew how to except certain claims from arbitration but did not do so for class claims.

23.     Indeed, there is additional, powerful evidence of SmileDirect's intention to arbitrate all disputes and not to exclude class claims. In September 2019 (after Claimant entered into the Arbitration Provision above and after the class action was filed against SmileDirect in federal court), SmileDirect <u>changed</u> the language in its consumer contract going forward by including an anti-class-action clause. This anti-class-action clause was inserted into the Consent and History and reads as follows: "I further agree that any arbitration under this agreement will take place on an individual basis, that class arbitrations and class actions are not permitted, and that I am agreeing to give up the ability to participate in a class action." (*See* Exhibit 14, attached

hereto, at 7.) This clause definitively shows that class actions were allowed under the language of the Consent and History prior to September 2019. Indeed, the AAA Arbitrators in *JPay, Inc. v. Kobel* made this exact finding in their decision, reasoning that inclusion of this type of class action waiver after a class claim was filed made clear that the defendant did not intend to prohibit class arbitration prior to redrafting. (*See* Exhibit 13 at 6-7.)

24.     Moreover, the Arbitration Provision contemplates multiple parties—using the language "all parties"—to whom the Demand should be sent, also making clear that multi-party arbitration was not precluded. Finally, SmileDirect selected AAA as the arbitration forum knowing that its rules expressly permitted class claims and argued to the United States District Court for the Middle District of Tennessee that those rules applied, depriving the court of jurisdiction to determine gateway issues, so can hardly complain now that Claimant and Class Members are employing those same rules.

## PARTIES

### A.     <u>Claimant</u>

25.     Dana Johnson is a resident of Florida who purchased aligners from SmileDirect. Johnson chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Johnson's teeth alignment, and represented that his alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment, in part because top aligners were never provided. SmileDirect admitted after developing the treatment plan that Johnson could not get the results it

had represented to him, but it did not provide a refund to Johnson. Johnson is physically handicapped and confined to a wheelchair and thus strongly requests Miami as the location for the hearing as he cannot easily travel by airplane and lives only one hour from Miami.

      **B.**    **Defendants**

26.    Defendant SmileDirectClub, LLC, ("SmileDirect") is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Nashville, Tennessee. SmileDirect operates its business in and from Tennessee and in each other state in which it does business nationwide, including Florida. SmileDirect operates in Florida and has approximately 34 shops in Florida.

27.    Defendant David Katzman is an individual who is the chief executive officer and chairman of SmileDirect and through his stock ownership, stock voting agreement, and position as a director of Camelot Venture Group controls the business operations of SmileDirect. David Katzman, through Camelot, also controlled the services provided by Steven Katzman and Alexander Fenkell to SmileDirect pursuant to a contract between SmileDirect and Camelot that he negotiated. The claims against David Katzman arise from the same facts as the claims against SmileDirect.

28.    Defendant Steven Katzman is the chief operating officer of SmileDirect and through his stock ownership, stock voting agreement, and position as a director of Camelot Venture Group controls the business operations of SmileDirect. The claims against Steven Katzman arise from the same facts as the claims against SmileDirect.

29.    Defendant Alexander Fenkell is a co-founder and director of SmileDirect. Fenkell is the point person for SmileDirect's marketing efforts. As such, he has been directly involved in developing the misleading and false advertising campaign used by SmileDirect. Fenkell appeared

on national television and publicly repeated several of the false and misleading marketing statements that he participated in creating. Specifically, Fenkell falsely stated that the FDA's investigation of SmileDirect had been "shut down." He also falsely stated that all clinical decisions related to SmileDirect's services were made by U.S. doctors. He further falsely stated that SmileDirect customers have a one-on-one relationship with a U.S. doctor. As a creator and direct participant in SmileDirect's false and misleading marketing campaign, Fenkell has personal liability for his conduct. Fenkell was also at all relevant times acting as an employee of Camelot Venture Group, and his conduct was within the scope of that employment. The claims against Alexander Fenkell arise from the same facts as the claims against SmileDirect.

30.     Defendant Jeffery Sulitzer is a dentist licensed in California and the chief clinical officer of SmileDirect. He resides in Happy Valley, Oregon. He is the spokesperson for SmileDirect and owns or leases SmileDirect shops in California. Sultizer has misrepresented the attributes, quality, and effects of SmileDirect's aligners on multiple media platforms, including the following:

- that SmileDirect customers receive the same level of care from SmileDirect as from traditional orthodontists;

- that a U.S. doctor prescribes the aligners used by SmileDirect customers; and

- that a U.S. doctor checks in on each customer every 90 days.

Sulitzer is personally liable for each false and misleading statement that he made on behalf of SmileDirect. The claims against Jeffery Sulitzer arise from the same facts as the claims against SmileDirect.

31.     Defendant Camelot Venture Group ("Camelot") is a corporation with its principal place of business in Michigan. Camelot is owned and controlled by David Katzman and is, as

described on its website, the largest shareholder of SmileDirect and the managing member of the limited liability company that controls SmileDirect. As such, Camelot—through its stock ownership, through its control as the managing member of SmileDirect, and through its ability to appoint David Katzman and Steven Katzman as the operating officers of SmileDirect—controls SmileDirect and is directly liable for its actions and violations of state and federal law. The claims against Camelot arise from the same facts as the claims against SmileDirect.

32.     The Katzman Defendants and Fenkell did not work directly for SmileDirect at all relevant times. Instead, they were employed by Camelot, which, pursuant to a management agreement with SmileDirect, appointed them as Named Executive Officers ("NEOs") of SmileDirect. Camelot also appointed Susan Greenspon Rammelt as general counsel of SmileDirect and directed day-to-day management of SmileDirect through other Camelot employees. As such, Camelot, along with the Katzmans, controlled the day-to-day operations of SmileDirect.

33.     David Katzman acknowledged, in the Prospectus, that he and the Camelot management team "work side by side with [SmileDirect] Team Members." (Exhibit 7 at 141.) Camelot was paid at least $150,000 per month for the direct management services it provided to SmileDirect.

34.     The Katzman Defendants have appeared on national television to discuss their control of SmileDirect's defense against the FTC and FDA complaints described above, demonstrating their intimate knowledge and control of SmileDirect's marketing and sales strategy, including the decision to market SmileDirect aligners without FDA approval. The Katzman Defendants and Camelot have positioned themselves as the decision makers for SmileDirect with respect to the issues alleged in this action.

35.     The actions of SmileDirect alleged herein relate to high-level decisions about marketing and business organization that were made at the executive level by Camelot and the NEOs it appointed. Those decisions, upon information and belief, were authorized, approved, and directed by the Katzman Defendants and Fenkell, who were thus knowing participants in each such decision and the harm resulting from each such decision. Each Defendant is thus liable, under law, for his or its "own acts and conduct" causing the injuries and giving rise to the causes of action alleged herein.

36.     In addition, the Katzman Defendants and Fenkell were agents of Camelot. As agents of Camelot, the Katzman Defendants and Fenkell caused injury to Claimant and Class Members. When causing that injury, the Katzman Defendants and Fenkell were acting on Camelot's business and within the scope of their employment with Camelot. Accordingly, Camelot has respondeat-superior liability for the conduct of the Katzman Defendants and Fenkell in connection with SmileDirect.

## JURISDICTION AND VENUE

37.     The AAA has jurisdiction over this Demand by virtue of SmileDirect's uniform Arbitration Provision. (*See* Exhibit 9.)

38.     Venue is proper in Florida because Claimant is a Florida resident, entered into his relationship with SmileDirect in Florida, and received goods and services from and through SmileDirect in Florida. Furthermore, Claimant is disabled and would have extreme difficulty traveling to any hearings outside of Florida.

## ADDITIONAL FACTS COMMON TO ALL CLAIMS FOR RELIEF

39.     SmileDirect was founded in or around 2014. Its initial management and capital were provided directly by Camelot, which remained its largest voting shareholder and the

managing member of the LLC, controlling its day-to-day business operations through both management and stockholder control.

40.     David Katzman and Steven Katzman, both of whom own and control Camelot, provide their services, respectively, as chief executive officer and chief operating officer pursuant to contractual agreements with Camelot and not directly to SmileDirect. Stated differently, it is Camelot who selected David Katzman and Steven Katzman to be the chief executive officer and chief operating officer, respectively, of SmileDirect and who directly controls their services to SmileDirect and those of Fenkell.

41.     SmileDirect describes itself as a "med-tech platform for transforming smiles." It states that its business purpose is to disrupt the current orthodontic model. SmileDirect also describes itself as a "middle man, making virtual connections between patients and dentists." In fact, the description of its business contained in the Prospectus and in its uniform marketing makes clear that SmileDirect is operating in the field of dentistry/orthodontics in every state in the United States—illegally.

42.     SmileDirect describes a "member journey" that customers of SmileDirect engage in as follows: "Members start their journey by visiting our website, where they can learn about how our process works, read firsthand reviews from other members, and view before and after photos. . . . Members can then order their aligners remotely."

43.     The remote ordering of a SmileDirect-manufactured aligner occurs in steps. Unlike in traditional orthodontics, none of these steps are supervised by a licensed dentist. Instead, a customer orders an "easy to use" "impression kit" online. This impression kit is mailed by SmileDirect to the customer and contains impression material, which must be mixed and fabricated by the customer. The impression material must be used within 30 minutes of its home

fabrication by the customer. The customer then returns the completed impression in a shipping box so the impression can be employed by SmileDirect in connection with its manufacture of aligners for the customer. SmileDirect falsely states that the impression material is used to create a digital picture of the customer's mouth that SmileDirect "doctors" employ to draft a "treatment plan" that contains protocols for how the customer's teeth might move during treatment.

44.     A SmileDirect customer also completes his or her own dental history without the assistance of a licensed dentist. As a result, these histories are often incomplete or, because they ask about medical conditions using complex dental terms, incorrect.

45.     According to a report authored by Hindenburg Research, dentists unanimously agree that the treatment offered by SmileDirect does not measure up to traditional orthodontic standards in several ways: "Throughout the course of our research, dentists and orthodontists were unanimous in telling us that SDC was missing the most vital parts of any orthodontic treatment, which include a comprehensive pre-screening and evaluation for complex legacy dental issues, professionally performed molds and/or scans, as well as continuing personalized care from a licensed professional." (Exhibit 15, attached hereto, at 5.)

46.     SmileDirect's Prospectus makes clear that the treatment plan itself is in fact prepared not by U.S. dentists, but by its staff of independent contractors in Costa Rica. (*See* Exhibit 7 at 68; *see also* Exhibit 16, attached hereto.) Stated differently, almost all the work in connection with the so-called treatment plan is prepared by persons who are not licensed as dentists in the United States. This foreign work is accomplished in 24-48 hours "to help minimize patient dropout (i.e., changing their mind)." (Exhibit 17, attached hereto, at 16.)

47.     SmileDirect states that a U.S. licensed dentist "approves" the treatment plan. In fact, to the extent that U.S. dentists are involved in the process, they are minimally involved.

SmileDirect has acknowledged in its "ELP participation agreement for 2017" that, to the extent a U.S. dentist "participates" in approving the treatment program, they are only paid if they actually approve the program and then are paid only $50. This "sign off" takes "only a few minutes" and "can be done from anywhere." (*See* Exhibit 17 at 16.) Some SmileDirect dentists regularly approve as many as 100 treatment programs per day. (*See* Exhibit 15 at 2.)

48.     SmileDirect's own practices make clear that the development of the so-called "treatment program" for the aligners, which it manufactures itself, is in fact done in Costa Rica by unlicensed persons and not by prescription of a U.S. dentist who has engaged in acceptable, legitimate review of the patient's orthodontic condition consistent with industry standards of patient care. SmileDirect's constant marketing claim that its aligners provide the same level of care as traditional orthodontics is false.

49.     Following a customer's payment of the fee for the aligners of approximately $1,900, SmileDirect itself manufactures the aligners on a 3-D printer. The aligners are then sent to the customer with instructions for their use.

50.     While SmileDirect states that the average treatment lasts approximately six months, many treatments last many months longer.

51.     SmileDirect states in its Prospectus that a treating doctor "monitor[s] the member's progress" (Exhibit 7 at 26) and that "at least every 90 days" a customer's photos are reviewed by a treating doctor, who may then "order any mid-course corrections or refinements" (*id.* at 147). SmileDirect, via Defendant Sulitzer, has further claimed publicly that a treating doctor checks in on each patient every 90 days. All of these claims are false. In fact, SmileDirect customers do not even know the identity of the dentists who are involved in their case (to the extent that they are involved). SmileDirect refuses to disclose the addresses or contact

information with respect to such dentists, and therefore no patient-doctor relationship is ever actually established. Many online complaints about SmileDirect relate to the fact that its customers could not reach the so-called "treating doctor."

52.     The communications between SmileDirect and customers are in fact handled by unlicensed administrative personnel. Complaints filed on the Better Business Bureau website (https://www.bbb.org/us/tn/nashville/profile/cosmetic-dentistry/smiledirectclub-0573-37111672), and elsewhere, which are incorporated by reference herein, involving thousands of customers, indicate that these administrative personnel regularly offer orthodontic and treatment advice through emails over the internet. The treating doctors who are allegedly assigned to monitor these customers' progress do not communicate directly with the customers and, in most cases, are not informed of the communications with customers or any advice that is given to them.

53.     Thus, while SmileDirect states in its Prospectus that, in its business model, there is "seamless communication with the member over the course of treatment" (Exhibit 7 at 26), this is a falsehood. Similarly, SmileDirect's statement that "each member's treating doctor is available to answer clinical questions" (Exhibit 7 at 162) is also a falsehood, given that SmileDirect customers do not even know who the "treating doctor" is or how to contact such treating doctor. Their contact with SmileDirect is through unlicensed administrative personnel, who handle the communication and advice offered by SmileDirect in connection with their dangerous and faulty product.

54.     SmileDirect acknowledges that it currently manufactures all of its aligners in Tennessee on a 3-D printer provided by Hewlett-Packard. At no time has SmileDirect sought approval from the FDA for the manufacture and distribution of these aligners, nor has it

submitted an application to the FDA under so-called Rule 510(k) seeking approval for the manufacture and distribution of such aligners.

55.     SmileDirect states that it has 700,000 customers and that its revenue this fiscal year will exceed $500 million. SmileDirect is currently operating at a substantial loss. In September 2019, it offered common shares in a public offering. Subsequent to the public offering, 98% of the voting shares—and day-to-day control of SmileDirect—remained with the Katzman Defendants and Camelot. The Defendants have acknowledged, in the Prospectus, that SmileDirect is a "controlled company" under their control. (Exhibit 7 at 180.)

### SMILEDIRECT'S NATIONAL MARKETING CAMPAIGN DESIGNED TO AFFECT CONSUMER CHOICE

56.     For the past several years, SmileDirect has been involved in one of the nation's largest marketing campaigns, which seeks to falsely promote SmileDirect's aligners and to denigrate traditional orthodontics using falsehoods.

57.     SmileDirect's marketing strategy was developed, in part, by Gin Lane, a major advertising agency, with the express purpose of persuading customers to avoid traditional orthodontic services, and to instead use SmileDirect. Among other things, SmileDirect advertised that, by using SmileDirect, customers could forgo visits to a dentist's office.

58.     SmileDirect has stated that it follows an omni-channel approach to marketing, using billboards (including in Times Square and the NYC Subway), Google, Facebook, Instagram, and other social media platforms to promote its aligners. In addition, SmileDirect has purchased advertising time during televised national sporting events, such as college football games. MediaRadar, an advertising analytics firm, indicates that SmileDirect spent over $100 million in marketing in 2018 and employed more than "250 different media properties."

59.     SmileDirect's marketing effort is so large that it has developed a 125-person, in house ad-agency to saturate the marketplace with its marketing falsehoods.

60.     SmileDirect's omni-channel marketing campaign uses literal falsities and misleading statements, as described herein, and is designed to falsely promote its products. Many of those false, misleading, and demeaning statements are contained in the dozens of online commercials compiled by iSpot.tv, including the following:

- Stating that "we can straighten your smile for 60% less than braces;"

- Stating that, "[i]f your aligners aren't a good fit for you, you get your money back;"

- Stating that "you shouldn't have to wear braces to get your smile;"

- Asking "why would anyone go to a dentist's office?;"

- Describing braces as including "embarrassing wires."

These false, misleading, and demeaning statements mislead consumers who would otherwise purchase traditional orthodontic services.

**SMILEDIRECT'S UNIFORM MISREPRESENTATIONS AND FRAUDULENT MARKETING STATEMENTS**

61.     The Defendants have disseminated numerous false and misleading statements to the purchasing public in an effort to advertise and promote the SmileDirect aligners as an alternative to traditional orthodontic treatment. As a result of these false and misleading statements, potential consumers of traditional orthodontic services (such as the Claimant), who would have otherwise sought treatment from providers of traditional orthodontic services, have instead purchased SmileDirect aligners.

62.    The false and misleading statements that the Defendants have disseminated to the public over the period of time during which they have offered the SmileDirect aligners for sale are described in more detail below.

### A. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who engage traditional dentists

63.    Defendant Sulitzer, the Chief Clinical Officer at SmileDirect, has stated that "[a]n individual who is requesting treatment by using SmileDirectClub's aligners is receiving the same level of care from a treating dentist-orthodontist as an individual visiting a traditional orthodontist or dentist for treatment." This statement was quoted in nationally distributed dental magazines and is repeated online in a blog prepared and used for marketing by SmileDirect called "Grin Life." This statement is materially false, deceptive, and fraudulent.

64.    It is beyond dispute that SmileDirect's business model provides a much lower level of care to customers than traditional orthodontics. In traditional orthodontics, licensed dentists physically examine their patients, take radiological images of their teeth and surrounding bone structure, establish a treatment plan, implement the plan, and review the progress of their patients and their devices in-office on a regular basis. But SmileDirect's entire business model is based on eliminating the direct patient-doctor contact on a regular and continuous basis that is employed in traditional orthodontics.

65.    In the Prospectus and in its other advertising, SmileDirect states that a treating doctor "monitor[s] the members' progress" and is able to have "seamless communication with the member over the course of treatment." (Exhibit 7 at 144.) Defendant Sulitzer has also publicly stated that a licensed doctor checks in on each SmileDirect customer every 90 days. These statements are false and misleading.

66.     In fact, patients do not interact with "treating doctors," either in person, by telephone, or through the SmileDirect internet platform. No doctor is ever identified to the customer as being their treating doctor, and communications between customers and SmileDirect take place through administrative personnel not trained in orthodontics or dentistry. This internet-based administrative interaction is nothing like the seamless communication between a treating doctor and the patient advertised by SmileDirect or employed in traditional orthodontics. Indeed, the SmileDirect "patient" does not even know who the purported dentist is.

67.     SmileDirect does not provide a patient-doctor relationship and does not identify to customers any doctor who is acting as "their doctor or prescriber." Included among the thousands of complaints lodged against SmileDirect on the internet are those that indicate that patients were unable to reach any actual doctor to describe and discuss their complaints and injuries resulting from their use of SmileDirect aligners.

68.     Similarly, SmileDirect advertises that customers who use its aligners do not have to undergo a dental exam prior to treatment. This advertising is an acknowledgement that SmileDirect's level of care is below the standard in orthodontics, where such an examination is required and deemed necessary.

69.     It is beyond dispute that SmileDirect's version of "teledentistry" is not consistent with the applicable medical standard of care for traditional dentists. Its false marketing injures consumers.

70.     Because SmileDirect does not use physical exams of customers to develop a treatment program or allow the treatment of its customers to be monitored by a licensed dentist, the level of care provided by SmileDirect is, in fact, of a lower quality than that received by a patient undergoing traditional orthodontic treatment. Specifically, SmileDirect is unable to

anticipate or correct issues that would be revealed by an x-ray, such as bite misalignment, gum disease, or the existence of implants. Furthermore, SmileDirect is unable to adjust the course of treatment if a customer's teeth do not respond as anticipated to treatment.

### B. Asserting that SmileDirect is employing teledentistry in accordance with industry standards

71.     SmileDirect represents to customers, in its marketing materials and its consent and history document, which forms the contract between SmileDirect and the customers, that customers are being served by "teledentistry." This representation is made in an effort to convince customers that they are receiving actual, industry-standard dental care. In fact, SmileDirect does not employ teledentistry.

72.     The ADA has a policy with respect to teledentistry that establishes the industry standard:

> The dentist is responsible for and retains the authority for ensuring the safety and quality of services provided to patients using teledentistry technologies and methods. Services delivered via teledentistry should be consistent with in-person services, and the delivery of services utilizing these modalities must abide by laws addressing privacy and security of a patient's dental and medical information.

SmileDirect plainly does not meet the industry standard for teledentistry in several respects.

73.     First, SmileDirect's services are not consistent with in-person services. SmileDirect's dentists do not physically examine customers' teeth so that, unlike with in-person services, SmileDirect dentists are unable to identify certain issues, such as gum disease, bite issues, or the existence of implants, that would be revealed with in-person services.

74.     Second, SmileDirect services are not consistent with in-person services in that SmileDirect customers are not required to provide their existing dental records. As a result, SmileDirect's dentists are not able to use a customer's dental history to inform the plan of treatment.

75.     Third, unlike with in-person services, SmileDirect's dentists do not actively prescribe the course of treatment for SmileDirect customers. Instead, SmileDirect dentists, at best, passively approve a course of treatment designed by unlicensed personnel.

76.     Fourth, unlike with in-person services, SmileDirect's dentists do not interact directly or even indirectly with customers. SmileDirect dentists never interact with the customers assigned to them. If a customer has an issue with SmileDirect's treatment, that customer is only able to speak with administrative personnel. Those administrative personnel are not overseen by the SmileDirect dentist assigned to the customer, and the SmileDirect dentist is not kept informed of the content of those communications. The SmileDirect administrative personnel are thus offering advice concerning orthodontics in an improper and illegal fashion on a regular basis.

77.     SmileDirect is aware that it does not follow the industry standard for teledentistry. It recently complained that California's teledentistry regulations were "anticompetitive" and imposed "unnecessary hurdles and costs." Furthermore, it is currently engaged in an effort to lobby "a handful" of states to pass new teledentistry legislation before SmileDirect faces challenges from regulators using existing regulations. California recently passed legislation making clear that SmileDirect's business model did not comply with California's standards for prescribing aligners.

78.     Because SmileDirect's business does not meet or follow the industry standard for teledentistry, the characterization of its business as teledentistry is fraudulent and misleading.

**C. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces"**

79.     While SmileDirect advertises that its treatment is "three times faster than braces," this is, in fact, a falsehood.

80. First, SmileDirect has no actual support for this statement. The time required for traditional orthodontics depends upon the level of care and the level of correction required. SmileDirect cannot show that it would achieve the same level of correction for a specified condition "three times faster than braces."

81. Second, because SmileDirect provides a lower quality of orthodontic care than a traditional orthodontic provider, its results cannot match those achieved in traditional orthodontic care, regardless of time period.

82. SmileDirect has thus deliberately misstated the efficacy of its product in comparison to traditional orthodontics.

**D. Engaging in deceptive practices and misrepresentations concerning SmileDirect's return policies**

83. When ordering an impression kit from SmileDirect, SmileDirect describes, in writing, "our smile guarantee." It states that "getting started is risk-free. If invisible aligners aren't a good fit for you, you'll get your money back." The Prospectus also describes this "Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied." (Exhibit 7 at 23.) In sum, the uniform disclosures made by SmileDirect make clear that customers who are not satisfied can avail themselves of the "Smile Guarantee" and get a total refund. Similarly, SmileDirect's commercials state that, "if aligners are not a good fir for you, you get your money back" and describe SmileDirect's aligners as "risk free."

84. This offer of a refund is fraudulent and deceptive because, in other disclosures, SmileDirect retracts its offer of a "smile guarantee" and limits or eliminates any refund possibility. Furthermore, SmileDirect does not offer a refund if the aligners are not a good fit, and its aligners are not, in fact, risk free.

85.     SmileDirect's standard form customer agreement contains a small-print, hidden waiver of any claim that might be asserted by a customer as against SmileDirect. Specifically, in a section of the agreement captioned "TELEHEALTH," buried in small print and appearing almost as a non sequitur in that paragraph, customers unknowingly represent that they "release SmileDirectClub from liability for any claim by me or any third party in connection with my participation or use of the invisible aligner treatment."

86.     This deliberately hidden provision, contained in a paragraph that does not address litigation waivers but "telehealth," appears to retract entirely the "smile guarantee"/refund policy stated by SmileDirect in its Prospectus and other documents.

87.     Although this waiver is plainly unenforceable under Tennessee and other state law—as providers of medical and related services cannot waive claims as against them for their own fraud and negligence—it is designed deceptively to prevent people from asserting any claim as against SmileDirect and availing themselves of the so-called "smile guarantee."

88.     Moreover, as demonstrated by the numerous online complaints regarding SmileDirect, SmileDirect does not in fact offer refunds when aligners are not a good fit.

89.     SmileDirect's representations and counter-representations with respect to its refund policy are deceptive trade practices and fraudulent under applicable law.

**E. Making misrepresentations and deceptive statements with respect to the ability of SmileDirect's aligners to address "bite issues"**

90.     SmileDirect engages in an extreme form of deception, misrepresentation, and fraudulent practice in connection with its representations concerning the ability of its aligners to address bite issues.

91.     In its advertising and emails to customers, SmileDirect states that it has helped "thousands of people with bite issues." (*See* Exhibit 3 at 5.) On its blog, "Grin Life," it

specifically states "our aligners may also correct bite issues" and "our aligners are designed to not only help straighten smiles, but they can also correct bite issues." These statements are misleading and deceptive because SmileDirect knows that its aligners cannot correct bite issues but only worsen them.

92.     As a result of the Defendants' misrepresentations regarding the ability of SmileDirect's aligners to address bite issues, many customers with bite issues have purchased SmileDirect aligners believing that their bite issues can be corrected without traditional orthodontic care.

93.     In fact, SmileDirect aligners cannot correct bite issues and, in many cases, can create new bite issues or aggravate existing bite issues. As a result, SmileDirect has received many complaints from customers whose spacing issues have been addressed, at least in part, by the aligners but for whom the aligners have worsened their bite issue or created a bite issue.

94.     Despite uniform advertising that its product can correct bite issues, SmileDirect, at the same time, disclaims the ability of its product to correct bite issues in the fine print of its customer contract. Therein, it makes customers represent that they understand that the aligner will only address alignment and will not correct any existing bite issue.

95.     SmileDirect's practice in this regard is a traditional "bait and switch" and a fraudulent and deceptive practice under Tennessee and other states' laws. Its practice of making a bold unambiguous promise that the aligners can correct underbites, overbites, and crossbites and then employing small-print language in a consent and history document to repudiate that promise is the definition of a deceptive practice.

**F. Misrepresenting the effect of SmileDirect's aligners upon customer heart rate and blood pressure.**

96.　　In its blog, Grin Life, SmileDirect, in a gross and deliberate fraudulent statement, states that use of its product will help reduce customer heart rate and blood pressure: "Here are 7 reasons investing in SmileDirectClub will pay dividends. . . . Your heart rate and blood pressure will decrease. . . ."

97.　　Stated simply, SmileDirect has no basis for these statements whatsoever. They are untrue, false, misleading, and deceptive.

**G. Making misrepresentations and deceptive statements with respect to customer satisfaction with SmileDirect aligners.**

98.　　SmileDirect is engaged in one of the largest nationwide campaigns for advertising ever with respect to a new consumer product, spending hundreds of millions of dollars a year advertising its product on television, on the internet, and in print.

99.　　In its Prospectus and advertising material, SmileDirect consistently states that "our members are highly satisfied." (Exhibit 7 at 123.) The Defendants make these statements because they know that potential customers are likely to purchase SmileDirect aligners if they believe they will be "highly satisfied" with the results and because they know that customers rely on the opinions of other customers when making purchasing decisions.

100.　　In fact, the Defendants' statements that SmileDirect customers are highly satisfied is false and deceptive.

101.　　SmileDirect knows that it has received <u>thousands</u> of serious, substantiated customer complaints with respect to the efficacy of its aligners and its business model. Indeed, the dissatisfaction of customers with the aligners is reflected by the fact that SmileDirect has received many low ratings on Yelp and the Better Business Bureau websites.

102.    By stating that its customers are highly satisfied and failing to acknowledge the thousands of complaints that it has received, SmileDirect is engaging in deceptive and misleading conduct. Among the thousands of complaints available on the internet (incorporated by reference herein) are the following:

- "We had nightmare experience with this company. We get no resolution after several emails and phone calls there has to be someone else that we can speak to. Our money is getting stolen from us."

- "[In] the seventh month, my crowning implant - which was super expensive to get done came off together. When I called them about this, they kept making me email people. They are generally super hard to get in contact with."

- "This company is truly a mess!!! Hopefully, my teeth will eventually be straight ... with all their delays, more like one and a half years instead of six months."

- "Had I had the opportunity to do this over again, I would have coughed up the extra dough and done it the right way with Invisalign. The quality of the tray simply weren't up to par. I was convinced that they sent me the wrong trays in later months because I wasn't seeing any incremental movement or straightening."

- Customer describing impact upon use of aligners: "A gap in my top teeth is fixed but I still cannot bite down with my front teeth, i.e. I cannot bite into a sandwich or a piece of meat."

- "Product made my teeth worse with spacing and gaps, did not work as described and was led to believe it would get fixed. I paid the full amount upfront for my treatment where I was promised straight teeth from one of their smile shop

employees. After five months and four broken aligners and a cracked tooth and numerous attempts to talk to the customer service to fix my issues, all of which led nowhere."

- "Product doesn't work, when brought to the attention of the company that it didn't work, the new aligners that were given were completely messed up. I'm eight months into my treatment and am very unhappy. They are made **horribly**. They are loose and don't even move my teeth. I'm spending thousands of dollars on these things for no reason."

- "Half a year of aligners with Smile Direct, and my most prominent teeth were WORSE. My girlfriends experience was just as bad. Her aligners keep cracking."

103.    In sum, SmileDirect has deliberately misrepresented the consumer reaction to its product. The consumer reaction has been substantially negative with thousands of customer complaints, which SmileDirect has not disclosed to the consuming public but instead misrepresented.

### H. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act and involves the illegal practice of dentistry.

104.    On or about April 25, 2019, the American Dental Association filed a detailed 20-page Citizen Petition with the FDA outlining why SmileDirect's self-manufactured and self-distributed aligner practice violates the FD&C Act. The FDA is currently addressing these issues. On October 10, 2019, the ADA confirmed that "[a]ll substantive issues raised by the ADA's citizen petition remain fully before the FDA at this time." (*See* Exhibit 18 at 1.)

105.    On May 8, 2019, a federal district court in Georgia found that SmileDirect is illegally practicing dentistry in the state of Georgia. (*See* Exhibit 1.)

106.    At no time has SmileDirect informed consumers that it is in violation of the FD&C Act and illegally practicing dentistry.

107.    Both of these nondisclosures are highly material and highly fraudulent because consumers would be reluctant to use SmileDirect's aligners in any capacity if they knew that they were being sold in violation of both federal and state law.

108.    SmileDirect's failure to make such disclosures has allowed it to keep its fraudulent schemes secret and to perpetuate its deceptive scheme upon consumers.

109.    Manufacturers and sellers of medical devices are prohibited from introducing or causing them to be introduced into interstate commerce if such device is misbranded. *See* FD&C Act § 301(a); FD&C Act § 301(b).

110.    The aligners manufactured by SmileDirect in its own facility are class two medical devices regulated by the FDA. These devices are subject to a "by prescription only" restriction that applies to other manufacturers of such aligners but that SmileDirect has effectively and illegally eluded.

111.    As shown herein, the aligner devices manufactured by SmileDirect are not provided by a prescription. Instead, the aligner program is developed by unlicensed medical personnel in Costa Rica, in connection with administrative staff in the United States, and then rubberstamped by SmileDirect's dentists, who receive only a $50 fee in connection with such process and, again, only if they approve the customer for treatment. Although these dentists are typically licensed in only one state, SmileDirect often allows them to approve treatment plans for customers located in states in which they are not licensed. This process does not comply with the requirements for an orthodontic prescription under applicable medical standards.

112.    As a manufacturer of its aligners, SmileDirect was legally obligated to seek FDA clearance for such product, likely pursuant to Rule 510(k). SmileDirect instead has decided to flout these legal requirements and is selling its product, which should be labeled and sold only by prescription, in an essentially over-the-counter fashion.

113.    SmileDirect's failure to inform consumers that its product is being sold in violation of the very consumer laws that are designed to protect them is a fraudulent practice in and of itself.

114.    As referenced above, on or about May 8, 2019, a federal district court in Georgia specifically refused to find that SmileDirect was not acting as a dentist after SmileDirect requested declaratory relief to that effect. In connection with denying declaratory relief to SmileDirect, the court made clear that SmileDirect's assertion that it was not acting as a dentist in the state of Georgia was baseless. This decision is likely to be followed by other courts in the near future. Indeed, California recently passed legislation effectively treating SmileDirect as a dentist and requiring a dentist to be present when SmileDirect provides services.

115.    The Georgia decision and its import have also not been disclosed to consumers by SmileDirect.

116.    SmileDirect is deliberately hiding from consumers—for competitive and monetary advantage—the fact that it is illegally operating as an unlicensed dentist in connection with its core business. Disclosure of this legal fact would directly impact SmileDirect's business model and result in potential customers choosing to use traditional orthodontics rather than SmileDirect's aligners.

## CLASS ALLEGATIONS

### A.     Class Definitions

117.    Claimant seeks to represent a class and a subclass in this case. Claimant reserves the right to add additional subclasses in this case.

118.    The class defined herein is the class of all customers who have used or otherwise paid for the SmileDirect aligner program and product. This class—the "Consumer Class"—asserts claims for violations of the Magnusson-Moss Act, breach of warranty, fraud, breach of contract, and violations of the Tennessee Consumer Protection Act of 1977 and other unfair or deceptive acts or practices statutes of the respective states in which such consumers reside, collectively. All Class Members have signed onto an arbitration clause identical to or substantially similar to the one at issue in this matter.

119.    Included in the class is a subclass. The "Florida Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in Florida.

120.    Excluded from the class are the Defendants, any entity in which the Defendants have a controlling interest, and the respective officers, directors, legal representatives, employees, successors, subsidiaries, and assigns of such persons and entities. Also excluded from the class are any individuals or entities who are party to the new anti-class-action clause added to SmileDirect's Consent and History in September 2019. All Class Members can be easily identified from SmileDirect's records, which include their names and addresses, and Claimant intends to offer each Class Member the right to opt out of the class.

**B.**    **Numerosity: Supplementary Rules for Class Arbitrations 4(a)(1)**

121.    The members of the class defined herein are so numerous that joinder of separate arbitrations on behalf of all members is impracticable.

122.    The Consumer Class, based upon statements made by SmileDirect, includes hundreds of thousands of members, potentially more than 700,000.

123.    The individuals' names and addresses for each class are already publicly available or available from the records of SmileDirect.

124.    Class Members may be notified of the pendency of this action by accepted and approved notice, directly and via publication.

**C.**    **Commonality and Predominance: Supplementary Rules for Class Arbitrations 4(a)(2) & 4(b)**

125.    This action involves common questions of law and fact that predominate over any questions affecting individual Class Members.

126.    Claimant's claims do not seek personal injury damages of any nature.

127.    The Consumer Class seeks only damages resulting from the misrepresentations and fraudulent and deceptive practices related to the sale and marketing of the SmileDirect aligners in the form of monetary and injunctive relief.

128.    The common questions of law and fact which predominate over questions affecting individual Class Members include without limitation:

    a.    whether SmileDirect knew or should have known that its aligners were being mis-marketed and misrepresented in nationwide commerce;

    b.    whether SmileDirect was violating federal law, including the FDC&A Act, in connection with its distribution of aligners that required FDA approval, but for which no FDA approval was received;

c.  whether SmileDirect has made deliberate misrepresentations with respect to the efficacy of its aligners and the purposes for which they may be used;

d.  whether SmileDirect has been illegally operating as a dentist in the various states in which it engages in commerce; and

e.  whether SmileDirect's practice of offering refunds and then refusing to make refunds based upon a fine-print waiver (that is unenforceable under state law) is a deceptive practice.

**D.  Typicality and Adequacy of Representation, Supplementary Rules for Class Arbitrations 4(a)(3), 4(a)(4) & 4(a)(5)**

129.  Claimant's claims or defenses are typical of the claims or defenses of the class.

130.  Claimant is an adequate class representative because his interests did not conflict with the interest of the other Class Members whom he seeks to represent.

131.  Claimant has retained counsel competent and experienced in complex class action litigation, including consumer litigation, and Claimant intends to prosecute this action vigorously.

132.  The class's interests will be fairly and adequately represented by Claimant and protected by Claimant and Claimant's counsel.

**E.  Superiority: Supplementary Rules for Class Arbitrations 4(b)**

133.  A class action is superior to any other available means for a fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this case.

134.  The damages or other financial detriment suffered by Claimant and the other Class Members are relatively small compared to the burden and expense that would be required

to individually litigate their claims against Defendants, so it would be impossible for Class Members to individually seek redress for Defendants' unlawful conduct.

135.    Even if each Class Member could afford arbitration of this magnitude, individualized arbitration would create a potential for inconsistent and contradictory decisions and dramatically increase the delay and expense to all parties and the system.

136.    By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, the common use of scale, and comprehensive supervision in a single forum.

     **F.**    **Additional Class Allegations**

137.    Each of the approximately 700,000 class members paid approximately $1,900 to SmileDirect as a result of SmileDirect's misrepresentations. Accordingly, the amount in controversy exceeds $5 million.

**COUNT ONE**

**VIOLATION OF MAGNUSON-MOSS ACT, 15 U.S.C. §§ 2301, et seq.**

**(On behalf of the entire Consumer Class)**

138.    The Claimant repeats and re-alleges the allegations set forth above as though fully set forth herein.

139.    The SmileDirect aligners are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

140.    The Claimant and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

141.    The Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

142.    Section 2310(d)(1) of Chapter 15 of the United States Code provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

143.    Defendants provided the Claimant and Class Members with written warranties in connection with the purchase of SmileDirect's aligners, each of which was a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

144.    Defendants breached these written warranties, as described in more detail above, and are therefore liable to Claimant and the Consumer Class pursuant to 15 U.S.C. § 2310(d)(1).

145.    Any efforts to limit the written warranties in a manner that would exclude coverage of SmileDirect's aligners is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the aligners is null and void.

146.    Pursuant to 15 U.S.C. § 2310(e), the Claimant is entitled to bring this class action and is not required to give Defendants notice and an opportunity to cure until such time as the Arbitrator determines the representative capacity of the Claimant.

147.    The Claimant's individual claims place into controversy an amount equal to or exceeding $25. The amount in controversy of this entire action, for all Class Members combined, exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. The Claimant, individually and on behalf of the other Class Members, seeks all warranty-based damages permitted by law, including diminution in value of their aligners, in an amount to be proven at hearing. In addition, pursuant to 15 U.S.C. § 2310(d)(2), the Claimant and the other Class Members are entitled to recover a sum equal to the

aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Arbitrator to have reasonably been incurred by the Claimant and the other Class Members in connection with the commencement and prosecution of this action.

148.    Further, the Claimant and the Class Members are entitled to equitable relief under 15 U.S.C. § 2310(d)(1).

## COUNT TWO

## BREACH OF EXPRESS WARRANTY UNDER TENNESSEE LAW

### (On behalf of the entire Consumer Class)

149.    The Claimant repeats and re-alleges the allegations set forth above as though fully set forth herein.

150.    By advertising that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists, Defendants expressly warranted to the Claimant and Class Members that SmileDirect's aligners complied with the standards of care of the orthodontic profession.

151.    SmileDirect and its aligners did not provide the same level of orthodontic care as a traditional dentist. Indeed, they did not even meet the baseline standards of care of the orthodontic profession. Accordingly, SmileDirect breached this express warranty.

152.    Moreover, Defendants made the following express warranties regarding SmileDirect's aligners, uniformly and in writing, through its advertisements:

    a.    that, in developing and producing its aligners, SmileDirect is employing the same level of care as traditional orthodontics and is employing teledentistry in accordance with industry standards;

    b.  that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

    c.  that SmileDirect's aligners were backed by a "smile guarantee" and were "risk free;"

    d.  that SmileDirect's aligners address "bite issues;"

    e.  that SmileDirect's aligners reduce customers' heart rate and blood pressure; and

    f.  that customers are highly satisfied with SmileDirect aligners.

By advertising these claims, Defendants expressly warranted to purchasers of SmileDirect's aligners, pursuant to Tenn. Code. § 47-2-313, that those aligners would exhibit the characteristics and the combination of characteristics claimed. Such statements became the basis of the bargain for the Claimant and Class Members because such statements are among the facts a reasonable consumer would consider material in the purchase of aligners for orthodontic treatment.

153.    In fact, SmileDirect's aligners did not comply with the standards of care of the orthodontic profession. As such, and for the reasons set forth herein, it was unlawful for SmileDirect to sell the aligners to the public.

154.    In addition, Defendants, through their advertising regarding SmileDirect, created an express warranty that SmileDirect's aligners produced certain orthodontic results, purportedly allowing consumers to make apples-to-apples comparisons with other types of orthodontic treatment.

155.    In fact, SmileDirect's aligners did not produce the claimed orthodontic results or otherwise exhibit the characteristics or the combination of characteristics claimed in its advertisements.

156.    As a result of the foregoing breaches of express warranty, the Claimant and Class Members have been damaged in that they purchased aligners that were unlawfully sold in breach of such warranties, did not comply with applicable standards of care, did not perform as promised, and were less valuable than what was paid for them. This loss of value can be calculated on a classwide basis.

## COUNT THREE

### COMMON LAW FRAUD

### (On behalf of the entire Consumer Class)

157.    The Claimant repeats and re-alleges the allegations set forth above as though fully set forth herein.

158.    Defendants intentionally made materially false and misleading uniform misrepresentations in writing regarding the qualities and applications of their aligners and related services.

159.    Defendants also intentionally omitted to state material information necessary for customers to properly evaluate the efficacy of the aligners and related services, including (1) that defendants were illegally operating as dentists in the United States and (2) that the sale of their product without FDA approval was in violation of federal law.

160.    The Claimant and Class Members reasonably relied upon Defendants' false and misleading representations made in writing and are presumed to have relied upon the material omissions outlined herein.

161.    The Claimant and Class Members did not know and had no reason to know that the products were misrepresented and that Defendants have failed to make material disclosures

with respect to their illegal conduct and their violations of federal and state law in connection with the distribution of the aligners and related services.

162.    Defendants intended that the Claimant and Class Members would rely upon the misrepresentations and omissions.

163.    The Claimant and Class Members have been injured as a result of Defendants' fraudulent conduct.

164.    Defendants are liable to the Claimant and Class Members for damages sustained as a result of Defendants' fraud.

## <u>COUNT FOUR</u>

### BREACH OF CONTRACT (IN THE ALTERNATIVE TO COUNT THREE FOR COMMON LAW FRAUD)

### (On behalf of the entire Consumer Class)

165.    The Claimant repeats and re-alleges the allegations set forth above as though fully set forth herein. In the alternative to Count Three for Common Law Fraud, Claimant alleges as follows on behalf of himself and the Consumer Class:

166.    Claimant and each Class Member has a valid and enforceable contract with SmileDirect for the provision of the goods and services described herein. These contracts are uniform contracts of adhesion, drafted by SmileDirect and imposed upon each of its customers.

167.    By representing and agreeing in its contractual documents with Claimant and Class Members, including in the consent and history document, that it will deliver certain goods and services including that a U.S. licensed dentist prescribes the treatment plan and aligners after determining the consumer is an appropriate candidate, and that the U.S. licensed dentist continues to monitor the patient throughout their course of treatment and handle all aspects of treatment, such that there is a doctor-patient relationship between a U.S. licensed dentist and the

consumer, and then failing to deliver such goods and services, SmileDirect has breached Claimant's and Class Members' contracts with it. In fact, a U.S. licensed dentist does not prescribe the treatment plan and aligners in accordance with applicable standards, does not monitor the patient throughout their course of treatment, does not handle all aspects of the patient's treatment, and, as a result, there is no doctor-patient relationship between a U.S. licensed dentist and the consumer.

168.    SmileDirect's breach is material and essential in that Claimant and Class Members would not have entered into their respective contracts with SmileDirect but for SmileDirect's representations and agreements described above.

169.    Claimant and Class Members have suffered injury and damages as a result of SmileDirect's breach. Claimant and Class Members each suffered the same type of injury, and damages can be calculated on a classwide basis.

## COUNT FIVE

## TENNESSEE CONSUMER PROTECTION ACT

### (On behalf of the entire Consumer Class)

170.    The Claimant repeats and re-alleges the allegations set forth above as though fully set forth herein.

171.    Defendants advertised and sold "goods" or "services" in "trade" and "commerce," as meant by Tenn. Code § 47-18-103.

172.    Defendants, operating in Tennessee, engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of Tenn. Code § 47-18-104, including but not limited to the following:

a. Causing likelihood of confusion or of misunderstanding as to the sponsorship, approval, or certification of goods or services, in violation of Tenn. Code § 47-18-104(b)(2),

b. Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another, in violation of Tenn. Code § 47-18-104(b)(3);

c. Representing that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have, in violation of Tenn. Code § 47-18-104(b)(5);

d. Representing that goods or services are of a particular standard, quality or grade, in violation of Tenn. Code § 47-18-104(b)(7);

e. Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law, in violation of Tenn. Code § 47-18-104(b)(12);

f. Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve, in violation of Tenn. Code § 47-18-104(b)(19); and

g. Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or

services to other goods or services, in violation of Tenn. Code § 47-18-104(b)(21).

173.     The above unlawful, unfair, and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Claimant and Class Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

174.     Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Claimant and Class Members.

175.     As a direct and proximate result of Defendants' deceptive acts and practices, Claimant and Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, for the Consumer Class, their loss of money paid to SmileDirect.

176.     Claimant and Class Members seek declaratory relief, injunctive relief, and attorneys' fees and costs under Tenn. Code § 47-18-109.

177.     Claimant seeks individual and classwide relief under Tenn. Code § 47-18-109, including, but not limited to, declaratory relief, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

## COUNT SIX

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**(On behalf of the Florida Consumer Subclass)**

178.    The Claimant repeats and re-alleges the allegations set forth above as though fully set forth herein.

179.    Defendants, operating in Florida, engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1). This includes but is not limited to the following:

a.  Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

b.  Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c.  Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d.  Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e.  Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f.  Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g.  Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

> h.   Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act and state laws.

180.   As a direct and proximate result of Defendants' deceptive acts and practices, Claimant and Florida Consumer Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, their loss of money paid to SmileDirect.

181.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that outweighed any benefits to consumers or to competition.

182.   Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Claimant and Florida Consumer Subclass Members.

183.   Claimant and Florida Consumer Subclass Members seek actual damages under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat. § 501.2105(1), to be proven at hearing.

184.   Claimant and Florida Consumer Subclass Members also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*

## REQUEST FOR RELIEF

WHEREFORE, Claimant, individually and on behalf of the other Class Members, respectfully requests that the Arbitrator award judgment in their favor and against Defendants, as follows and/or do the following:

A.     Find and declare that the Arbitrator has exclusive authority to determine that this arbitration should proceed as a class arbitration.

B.     Certify this arbitration as a class arbitration, proper and maintainable pursuant to the Supplementary Rules for Class Arbitrations; declare that Claimant is a proper class representative; and approve Claimant's attorneys as Class Counsel;

C.     Award permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.     Award Claimant and the other Class Members compensatory, consequential, and general damages in an amount to be determined at hearing;

E.     Award statutory damages, legal fees, and punitive or exemplary damages, to the extent permitted by law;

F.     Find and declare the unlawful acts alleged in this Demand to be unfair and deceptive business acts and practices in violation of the Tennessee Consumer Protection Act and the Florida Deceptive and Unfair Trade Practices Act;

G.     Find and declare that Camelot be held liable under the doctrine of respondeat superior for the conduct of David Katzman, Steven Katzman, and Alexander Fenkell;

H.      Award the declaratory relief sought herein;

I.     Award to Claimant the costs and disbursements of the action, along with reasonable attorneys' fees, including fees and expenses;

J.      Award pre- and post-judgment interest at the maximum legal rate; and

K.      Award and grant all such other relief as the Arbitrator deems just and proper.

Date: January 27, 2020

Respectfully submitted,

s/ William T. Paulk, Florida Bar # 52800
Robert K. Spotswood, Alabama Bar # ASB-7015-P76R
Michael T. Sansbury, Alabama Bar # ASB-6473-A53S
William T. Paulk, Florida Bar # 52800
Joshua K. Payne, Alabama Bar # ASB-1041-A55P
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North
Suite 700
Birmingham, Alabama 35203
TEL: (205) 986-3620
FAX: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
wpaulk@spotswoodllc.com
jpayne@spotswoodllc.com

Edward M. Yarbrough, TNBPR#004097
W. Justin Adams, TNBPR#022433
BONE MCALLESTER NORTON PLLC
511 Union Street, Suite 1600
Nashville, Tennessee 37219
TEL: (615) 238-6390
FAX: (615) 687-6990
eyarbrough@bonelaw.com
wjadams@bonelaw.com

Richard Stone, U.S. Dist. Ct. S.D.N.Y. Bar # RS5324
BLACKNER, STONE & ASSOCS.
123 Australian Avenue
Palm Beach, Florida 33480
TEL: 561-804-9569
rstoneesq@aol.com

*Attorneys for the Claimant*